Case number 22-2084, Andrew Woodburn v. Bryan Morrison, arguments not to proceed, 15 minutes per side. Mr. Foster, you may proceed for the appellant. Thank you. Good morning, Mitch Foster for Andrew Woodburn. So Andrew, known as Andy, was denied the effective assistance of counsel because his attorney at his trial failed to consider the only viable defense. And that was temporary insanity based upon involuntary intoxication by prescription medication. So here we have a motion for relief from judgment, a post-conviction motion in Michigan, which does not automatically lead to an evidentiary hearing. You talking about his habeas petition or something? No, no, the state court petition, which is called a motion for relief from judgment, which is a post-conviction after the direct appeal is over. So he filed what's called a motion for relief from judgment, and with that he had the lengthy affidavit of Dr. David Healy, who is an unquestioned, one of the world's greatest experts in terms of SSRIs and Paxil, and I attached through that, it's in the records, his CV, I think 200 different scholarly articles he's written. He's also been an expert that's consulted with GlaxoSmithKline and other pharmaceutical companies. Just to make sure I'm understanding, we're assessing the effectiveness of his original trial counsel, right? Yes, that's correct. And Mr. Woodburn tells his trial counsel that it was an accident, repeatedly, right? This whole business on Black River Trail where he smashes into the police car. He says it was an accident. He's thrown a bottle of rum out the window, right? Rum and cigarettes, which makes no logical sense. Okay, now there were some, a neighbor found some bottles in that vicinity, right? I mean, I'm just trying to kind of put ourselves in the shoes of trial counsel. So we know the facts of the accident. His client says, or the wreck, to be neutral. His client says that it was an accident and that he drank a bottle of rum that day, right? But did he also say that he took Paxil? Yes, yes. He was prescribed Paxil. But did he tell his lawyer that? Yes. And he, the lawyer prepared an affidavit for me. We filed it. He never consulted with a mental health, or a medical doctor to even consider the issue of involuntary intoxication. For all we know, the lawyer didn't even know that that defense existed. Could I ask you two questions about Healy, sort of before I forget them, because you raised that earlier on in your argument here this morning. I just want to make sure that I understand correctly that you mentioned at the beginning that he didn't get a hearing and you'd like him to have an evidentiary hearing. But it seemed in reading this that at least in the state post-conviction proceedings that sometimes we colloquially, I think, say state habeas. In the state habeas, he presented Healy and he presented all this other stuff you're talking about. So I couldn't find in the record what it is you wanted to present to the federal district judge in an evidentiary hearing that you hadn't already contained in the state habeas hearing. Well, first of all, thank you, Judge McKeague, for that. But there was no sworn testimony. So all we have is affidavits and the trial judge picked and chose and cherry-picked what he thought was appropriate to deny the motion for relief from judgment. That begs the question as to whether there actually was more evidence. I understand there might be a difference in the form of the evidence, affidavit versus testimony. I'm not familiar with any case law that says because you want to present it in a different form, you get an evidentiary hearing. So that was the first thing I wondered about. Then the second thing is what you want to talk about is you want to talk about Healy's affidavit and or testimony if you had been able to present it. But your main guy says that nobody knew about this at the time this all happened, at the time that the attorney was trying to determine what the defense was going to be. Your guy even testified that not even the doctors knew about it. So if the doctors didn't know about it, then under the double deference that this decision is accorded under AEDPA, I just don't see how you can win on that. So if you could hone in on that for just a minute or two, I'd be grateful. Yes, thank you. I think you're referring to what Dr. Healy said about the 95% of the doctors may not have been aware. Is that kind of what you're getting at? Exactly. Okay. And if 95% of the doctors aren't aware of it, how do you expect a defense counsel at that point in time to be aware of it? Right. Well, here's what I'd like to say about that. There was a GlaxoSmithKline study back in 2003 where Paxil specifically doubled the emotional condition of people, made it ineffective, doubled the severity of it, and led to suicidal and aggressive behavior. And then in 2007, the FDA admitted warnings about SSRIs and things to be guarded against. So the doctors may not have known, and maybe that's an error of the system in general in terms of prescribing medication. But I think that misses the point about whether an attorney should be diligent in finding out. Because you can go on Google really quickly and find all sorts of dangers with Paxil. And we're not talking about the average everyday user. We're talking about the small percentage. Like when you go on TV and you see all these ads for prescription drugs and then all these horrible side effects. But people take them every day. So that's a very small percentage of the people that are affected. You have a case that comes even close to saying that even though the doctors didn't know, that a lawyer should have discovered what the doctors didn't know. Is there a case that even gets anywhere near that you're relying on? Not that I'm aware of, Judge, but I don't think I need a case. Because again, we're not talking about whether doctors should know or should not have known. We're talking about, okay, what should an attorney do when he's exploring all the viable defenses? And when you have a case where there's clear evidence of intent based on a 911 call, and there's no other way to refute that intent other than to say, this is why he said the things he said. And this is why his mother said what she said on the 911 call. Because it's the only viable defense. And any attorney can look at all the side effects and the dangers of Paxil and SSRIs and all the reports and studies and FDA warnings and look and say, maybe we should at least consult with a medical expert before we just say, okay, let's go through the motions and have a slow guilty plea. My understanding is that your client had taken Paxil before and had had an adverse reaction in taking it. Was that adverse reaction related to consuming alcohol as well? I will answer that, yes, as an offer of proof in the evidentiary hearing. Andy will testify with more of the detail of the back and forth with Dr. Baltzer and what he told him about his previous experiences with Paxil. But number one, as an offer of proof, the medication that Dr. Baltzer prescribed was double the dosage he ever had before. And number two, and I think it's in Dr. Healy's affidavit, that Dr. Baltzer convinced Andy that the alcohol side effects, the craving for alcohol, wasn't from the Paxil. It must have been from some other sources going on in his life. So we have a patient that's relying on a medical expert and also if the evidentiary is granted as an offer of proof, his mother, Sharon Woodburn, she was a nurse, and she was encouraging Andy to follow the doctor's recommendation. So when you say these are offers of proof, was this evidence introduced at the state post-conviction hearing or not? Not in any sort of sworn testimony. I don't have an affidavit from Andy's mother. I do have an affidavit from the trial attorney that he didn't consider the defenses. I have Dr. Healy's affidavit where he describes how the doctor that Andy saw, Dr. Baltzer, convinced him to take this medication knowing that Andy expressed concerns. But with an evidentiary hearing, we'd be able to get into more specific details of Andy's interactions with the doctor. There are a number of recent Supreme Court cases that suggest that the opportunities for an evidentiary hearing in federal court are pretty limited, especially when you've had an evidentiary hearing in state court. What takes your case out of that realm of precedent? Judge Moore, there was no evidentiary hearing in state court. There was one on direct appeal on a different issue before Andy even raised the issue of ineffective counsel for failing to consider this defense. So that might be a little confusing in the record. There was no opportunity to present this evidence. There was no evidentiary hearing on this. All we have is what I submitted in the original motion and the affidavits. So without an evidentiary hearing, we don't have the opportunity to even consider that. And one other thing I would like to add about the judge at the trial level and the district court level repeated what the trial judge said. He said that Andy was not intoxicated at all by Paxil. Paxil was only a mechanism to get to alcohol intoxication. But the alcohol level was a very low level. It was barely over the legal limit and that wouldn't be anywhere near temporary insanity. First of all, alcohol is not a defense anyways unless it's like such a level. It's like .30 or whatever that completely blitzed level is and even that's not a defense in most jurisdictions. What was the alcohol level? I think it was like right at the .08, .09 level. I can't remember if that's a matter of record or part of the offer of proof. But the point is that Dr. Healy in his report said that there was intoxication by Paxil before you even get to the alcohol. Now the alcohol combined with Paxil makes it even worse. But also as an offer of proof, just recently in 2023 there's been studies and reports and I think the Canadian medical system says that anyone with an alcohol disorder should not even be prescribed SSRIs because it's so dangerous in the combinations. I appreciate the fact that you're saying offer of proof, offer of proof, offer of proof. But what is the significance of alcohol knowledges in 2023 in connection with an incident that if I remember right occurred in I think was it 2007 or 2013, something like that? Yeah, it was quite a few years ago but I think it's important. We're trying to figure out whether this lawyer satisfied Strickland and you're saying he didn't because of deficient performance based on knowledge 10 years later. I mean that doesn't make sense to me. Well that was just one additional thing that we would be able to get into at the evidentiary hearing but going back to the time where the lawyer was assessed. Why would you even be able to get into it at the evidentiary hearing? Something happened 10 years ago. We're limited by what the record was that was developed before the state court in determining whether this guy's constitutional rights were violated. Right and I appreciate that but we still have the FDA warnings back in 2007. We have the GlaxoSmithKline study in 2003 which expresses the dangers, the risks of severe emotional problems and increased suicidal ideation and thoughts of that and we've had a lot of experience of people acting out, acting bizarrely on Paxil. Just looking at the facts of this case, when you've got Andy driving down this road at 50 miles an hour trying to make a sharp turn, in hindsight he's like there's no way I could have made that turn but at the time based on the Paxil intoxication and his delirium, his disorganized thinking and all of that could have been easily found by the attorney at the time. I see that your time is up for this point. You've gone over more than a minute. So if you want to save your rebuttal time. Yes, I would like to save that. Thank you. Good morning, your honors. May it please the court. Assistant Attorney General Marissa Wiesen on behalf of Respondent Brian Morrison. I want to start by addressing this panel's questions about the evidentiary hearing. There are multiple reasons why an evidentiary hearing is not warranted in this case. The first being that this issue was adjudicated on the merits by the state trial court when it denied Mr. Woodburn's motion for relief from judgment. It's a very clear merits ruling. Mr. Woodburn does not now dispute that it was not a merits ruling. So under both ADPA, Penholster, and 2254D, an evidentiary hearing is barred in this case. It's not just not warranted, it's barred. The other issue here is that Mr. Woodburn's purported offers of proof, he seeks to introduce, I think it's at least nine witnesses at the evidentiary hearing. That's an entire re-litigation of this case, and that's not the purpose of an evidentiary hearing. And that's very clear under Supreme Court case law, ADPA, and Penholster. Was there an evidentiary hearing in state court? Yes, Your Honor, there was. There was an evidentiary hearing on other ineffective assistance of counsel claims in the direct appeal, I think as my opposing counsel pointed out. There was no evidentiary hearing on this issue in the post-conviction motion for relief from judgment. That request was denied by the trial court. But there was a merits ruling on this particular kind of version of IAC? Yes, absolutely. A very well-reasoned, well-thought-out, detailed opinion by the trial court on this issue. And that's where we get the bar under ADPA and Penholster for an evidentiary hearing at this point. I also wanted to go back. So just trying to think sort of broadly about this. The defense lawyer apparently knew that the defendant was taking Paxil and had had a bottle of rum and then engaged in this driving behavior, which resulted in damage to the police car, where the policeman was nearby at least. And your opponent says that there are these studies from before 2013 when this event took place that suggest that Paxil can lead to aberrational behavior. Why wouldn't that be enough to require the defense attorney to investigate whether the combination of Paxil leading to an urge to drink led to this whole thing that could then be a defense to the criminal charge? There is a duty to investigate a substantial defense, and that's clearly established law. This was not a substantial defense. First, it was Mr. Woodburn himself who avowed the accident theory. And this is actually in the record of the only Ginther hearing on direct appeal. Mr. Woodburn's attorney says multiple times, Mr. Woodburn was adamant this was an accident. I was reaching down to the floor of my truck. I reached up, grabbed a bottle. I saw the police officer. I was afraid of getting a DUI, so I threw it out the window. That's why I accelerated. That's why I hit the police officer. And his attorney testified to this at trial. But the other critical point here is that even if there was some evidence presented to the trial attorney that Mr. Woodburn was on Paxil, there's no evidence in the record that Mr. Woodburn ever asserted this temporary insanity or involuntary intoxication defense. We have nothing in the record that his counsel was ever aware that that was, of course, we have him asserting an accident theory instead. But the counsel is supposed to investigate things without necessarily relying on a defendant to create a theory. So why wouldn't a capable, effective lawyer investigate the taking of a prescribed drug that apparently there's a 2003 study and a 2007 study that say, hey, people who take SSRIs or Paxil have these maybe aberrational events that happen? Well, I think this fails for two reasons and why counsel was not performing deficiently. First, as I mentioned, Mr. Woodburn said it was an accident. He didn't say he was temporarily insane. He never mentioned that even Paxil caused him to crave alcohol. There's nothing in the record that he told his attorney that. But on top of that, even if counsel, and I don't concede this, but even if counsel had a duty to then investigate this defense, what counsel would have discovered is first that Dr. Healy, I'm sorry, has been at best his opinions have been questioned in other federal cases and at worst they've been entirely excluded. For example, there's a case from the, I believe it's Kansas, and then affirms by the 10th Circuit where his opinions on SSRIs and antidepressants and their effects on patients was entirely excluded in that case. But more importantly even is that counsel would have discovered that this is not a defense under Michigan law. In order to assert a temporary insanity defense by way of involuntary intoxication under Michigan state law, which this court is now bound by the trial court's adjudication of that on a state law issue, the intoxication must be involuntary. But as you mentioned, Judge Moore, Mr. Woodburn knew that Paxil was causing these cravings as far back as I believe 2004, and that's clear in the record. He knew this effect that Paxil was having on him, and he continued to take it. The second factor... He continued to take it. He stopped taking it, and then he started to take it because his new doctor when he moved to Michigan said, I think you should be on Paxil. Yes, that's correct. He was on and off the drug for approximately 9 to 10 years at issue here. But the second factor under Cawley is that the drug must cause the intoxication. Mr. Woodburn does not assert that Paxil caused him some type of independent harm. It's the combination of alcohol and Paxil that he asserts was the basis for this temporary insanity. He knew he was ingesting alcohol. There's no dispute in the record of that. He also would know that alcohol causes him to be intoxicated. That's a well-known fact, especially a bottle of rum in the middle of the day. I think anybody would... What was his level of... As I understand, his blood alcohol level was not introduced in the record at trial, but I believe it was somewhere between .08 and .12 in two different tests, one taken immediately after the accident, I'm sorry, the incident, and one taken a little bit later. Where does the bottle of rum quote come from? That comes from Mr. Woodburn himself. He testified, I drank a bottle of rum. There was no dispute that alcohol was involved in this incident. But I would go back to the blood alcohol level. I mean, this is very... In Michigan, it's .08 where you cannot drive a vehicle. We're talking very minimal amount over the ability to not drive a vehicle. To say that this caused him to then become temporarily insane is really just illogical and implausible. But I want to go back to the issue of Michigan state law. In People v. Osborne, the Michigan Court of Appeals has rejected this very defense. There, the defendant consumed Klonopin and alcohol, and the Michigan Court of Appeals said, this doesn't work. This doesn't work under Cawley. It's the alcohol that made you intoxicated, not the Klonopin. And this two-substance theory of involuntary intoxication is not viable under Michigan law. What year was that case? That was in 2014, Your Honor. So this event happened in June of 2013. So is that Michigan Court of Appeals case subsequent to the conclusion of his criminal... It was subsequent to the conclusion of his criminal trial, yes. But it would not have been subsequent to the following direct appeal. So would it be binding during his direct appeal under Michigan law? It's an unpublished case. So whether or not it would be binding would be a statewide issue. But Cawley, which sets forth these various, these three factors to assert a temporary insanity by way of involuntary intoxication defense, was published and was in effect at the time of Mr. Woodburn's trial. What are those three factors? So the intoxication must be involuntary, right? And here, of course, we have Mr. Woodburn knew that back so far. I just, in the abstract, just what are the headwinds that the lawyer's facing as he might contemplate this theory of temporary insanity? Sure. So the first is the intoxication must be involuntary. The second is the drug must cause the intoxication, not another intoxicant. And then the third factor is that the intoxication rendered the defendant temporarily insane. And the definition of insanity, and this is People v. Carpenter also established at the time of Mr. Woodburn's trial, is that the defendant lacked the capacity to appreciate the nature of his conduct and was unable to understand right from wrong. That would seem to be a factor that would deserve some emphasis. That has not been heavily emphasized.  I think all three of these are strongly against counsel presenting this defense. But the third, most importantly, is that Mr. Woodburn was the opposite of insane when he crashed into a police vehicle. He recalled all of the details of the day. He knew what he was wearing. He knew how much exactly he had to drink. He recalled the argument with his parents. He recalled what he had for lunch. He knew what he was wearing. And he made this deliberate decision, hey, I see a police officer. I don't want to get a DUI, so I'm going to reach down and try and get rid of the evidence, right? That's a very, you know, he understood reality. He knew the consequences of his actions at that very moment. I think that's very telling of his capacity. Your opponent has portrayed it as he was driving 50 miles an hour down a gravel lane, unpaved, and going to make a sharp perpendicular turn that no sane person would think they could do. Well, I think if that's the definition of insanity, then everyone who commits a crime is insane. And that's just not it. He, here, Mr. Woodburn understood the consequences. And again, after he was in the vehicle after the incident, he told the officer to shoot him. And that was his plan all along. He said, just shoot me. And that was his plan all along, right? His mom called 911 saying, my son is attempting suicide by cop. This was what he wanted to do that day. That was his intent. I thought that she called saying that he was acting irrational and that she was afraid of her own safety. Am I missing that initial statement? She also said that. That's correct. She also said that Mr. Woodburn would likely shoot anyone in his way. He also made a statement. He can be overheard in the 911 call. He can be overheard saying, and I don't have their direct quote in front of me, but he says, dead. If you call the cops, you're dead. He disputes whether it was dead or done, but I think the effect of that statement, dead or done, is that he intends somebody to die today. That conflicts, though, with his accident theory afterward, right? It certainly does, but he was the one who took the stand and asserted the accident theory. I don't know that he had another defense at that point. On your statement of the three components to the Michigan law on this, the second one strikes me as the one that you could hang your whole case on, that the drug, i.e. the Paxil, must cause the intoxication. Yes. And there's not been any even attempt of proof that the Paxil caused intoxication here. It was that the Paxil caused him to imbibe an excess amount of alcohol. Am I correct on that? You're absolutely correct, Your Honor. There is no even allegation in the briefing or the record that Paxil caused some type of independent harm, that without alcohol, Mr. Woodburn was temporarily insane by the Paxil. There's no allegation of that. Has there been a case in Michigan ever where someone has met that second requirement? Your Honor, I'm not aware of a case. I am aware of, like I mentioned, People v. Osborne and multiple other unpublished court of appeals cases where it's been held that the defendant did not meet that standard. So you could imagine, just speaking hypothetically, you could imagine that a doctor might erroneously prescribe an excessive dose of something like Paxil or some other medicine that could, on a particular person, cause them to be totally non-lucid. We can use whatever term we want, but it could happen that somebody could have been prescribed a drug that could cause them to be temporarily insane. Is that right? I certainly think that's a possibility, and that's what Cawley leaves open. But it doesn't leave open that the other intoxicant, which here is alcohol, caused the involuntary intoxication. It has to be the drug. Thank you. And I see my time is up, so I would just thank you for your time and ask that this Court affirm the District Court's decision denying PBS relief. Thank you. So one thing I'd like to point out is that it is a matter of record that Dr. Healy said the primary intoxication was from the Paxil. If you look at page ID 1359, which is record 612, and if you have paragraph 64, it says, First, in this case, there was an intoxication with Paxil. This was an involuntary intoxication. How would he know that? This is like years later, right? He reviewed the record, and there was extensive record. He reviewed the trial testimony about the bizarre behavior, and that was, I think, at the minimal standard, he presented a prima facie case that there was a defense to be made, and that should have led to an evidentiary hearing to say, Okay, give us more details. But we already have his bizarre behavior, and he's throwing cigarettes out the window, thinking that that's some sort of a crime, and then he thinks he can make this turn because his thoughts are disorganized. And then we have the studies about suicide. Okay, if it's suicide by cop or whatever it is. All of this happened after he had drunk the rum, right? Yes. So how do we know it was the Paxil that caused it as opposed to the rum that caused it? Based on Dr. Healy's expertise, his knowledge of the studies, and his consultation with the pharmaceutical industry, and all of the SSRIs and the danger, and how they lead to suicides and aggressive behavior in rare instances. If 95% of doctors weren't aware of this at the time, what reason is there to think that a lawyer who even pursues this is going to find a Dr. Healy as opposed to the 95% who would say, I don't really see anything here? Because Dr. Healy could have easily, I mean, the attorney could have easily done a Google search and found all sorts of side effects from Paxil. In the vast majority of patients, those don't exist, but it's out there and it's easily found. All right. And your time is up now again. I wish I had more time because this is a very complex issue, but I appreciate the time that I have. Thank you. I wish you to grant the writ and at the minimum grant a new appeal because we argued ineffective appellate counsel. But I think we should win the case. Thank you very much. Thank you very much. The case will be submitted. And would the clerk call the next case, please?